IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LARRY WHITE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 8558 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Larry White, Sr. ("White") seeks judicial review pursuant to the Social Security Act ("Act"),[1] more specifically Sections 405(g) and 1383(c)(3), of the final decision of Commissioner of Social Security Michael J. Astrue ("Commissioner") denying White's claim for supplemental security income ("SSI") disability benefits. White has alternatively moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 or to remand for further proceedings, while Commissioner seeks affirmance of the decision (effectively a cross-motion for summary judgment). For the reasons stated in this memorandum opinion and order, both motions for summary judgment are denied and White's alternative motion for remand is granted.

---

[1] All statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. §--." Finally, citations to Commissioner's memorandum take the form "Comm. Mem. --."

1

## Procedural Background[2]

On May 27, 2008 White filed an application for disability insurance and SSI (R. 16). Because White's insured status had expired on September 30, 2007 (id.), he needed to establish a disability on or before that date to be entitled to disability benefits (id.). To that end White's application alleged disability beginning on June 1, 2005 (id.).

On August 22, 2008 White's claims were denied (id.), and they were again denied on reconsideration on December 2, 2008 (id.). On January 8, 2009 White filed a timely request for a hearing (id.), and Administrative Law Judge Percival Harmon ("ALJ Harmon") held that hearing on July 14, 2010 (R. 34).

On September 20, 2010 ALJ Harmon ruled that White was currently disabled but that he had not become disabled until June 9, 2009 (when his status changed due to a change in age category) (R. 23-25). ALJ Harmon found that White was not disabled before that date because, despite his alleged limitations, he could still perform a significant number of jobs in the national economy (id.). White requested review by the Appeals Council, but his request was denied on September 29, 2011 (R. 1). ALJ Harmon's decision was accordingly left as the final decision of the Commissioner (id.). On February 6, 2012 White filed this action.

## General Background

White, born on June 10, 1959, was 50 years old on the date that ALJ Harmon

---

[2] What follows in the next sections of the text is drawn from the administrative record (cited "R--").

found him to be disabled (R. 185). White has a high school education and has previously worked at a mortgage company as an owner, an account executive and a loan officer (R. 209-10, 213, 215-22).

White's application for disability benefits asserted that his medical conditions prevented him from working. That application identified the causes of his inability to work as Graves' Disease, a sciatic condition, nerve damage on his left side and depression (R. 208, 337, 366). White asserts that those conditions have caused a variety of limitations that severely restrict his ability to work and carry on normal activities.

## Medical Evidence

In 2002, after complaining of back pain that radiated down his left leg, White was diagnosed with chronic lumbosacral strain and sciatica extending into his left leg (R. 301, 364). White continued to suffer pain from the lumbar strain and the sciatica when, in July 2005, he sought additional medical treatment after he also began suffering from fatigue, extreme weight loss, muscle weakness, chills, night sweats, blurred vision and dizziness (R. 293, 306, 311-12, 373-74). White lost about 30 to 35 pounds between June and September 2005 (R. 293, 311-12, 316).

In November 2005 doctors diagnosed White with Graves' Disease, "an enlarged thyroid with overactivity of the thyroid gland" (R. 78) (R. 314-19). Despite receiving radioactive iodine therapy to treat the condition, White continued to feel extreme lethargy and experienced rapid weight gain (R. 314-19, 364, 372). Doctors prescribed various medications, including Flexeril, Tylenol 3, Levothroxine and

3

Xanax (R. 298, 301, 321, 331, 337, 374, 384, 391).

White's treating physician Dr. Georges Germain treated White throughout the course of his illness, beginning in 2001 (R. 380). On May 21, 2009 Dr. Germain wrote a letter stating that White suffered from chronic lumbosacral strain with sciatica, long standing hypothroidism and severe depression, with these effects (R. 364).

> Because of the above [listed conditions] [White] has been gaining excessive amounts of weight that has aggravated his lumbo-sacral discomfort to the point where it has been impossible to carry the daily working activities. His depression has caused severe memory lapses. He has been evaluated by a psychiatrist that confirmed the diagnosis however he has not be treated. In 2005 Larry's [White's] condition deteriorated to the point where he became incapable of working. Larry is still disabled and probably will remain so for at least a year or two.

Dr. Germain wrote another letter on March 25, 2010 giving an overview of various symptoms and stating (R.277):

> I believe that Mr. White is unable to accomplish any competitive work and will continue to exhibit the above symptoms for a long time to come. His chances for recovery are little to moderate.

Dr. Germain also completed a "Multiple Impairment Questionnaire" (the "Questionnaire") summarizing multiple findings relevant to this case (R. 380-87). Dr. Germain stated there that White suffers from chronic lumbosacral pain and sciatica, hyperthyroidism and depression, and he summarized some of the symptoms resultant from those conditions (R. 380-87). Dr. Germain said that White suffered from "mild to moderate" pain that is "constant but punctuated by bouts of exacerbations" and that "any effort [or] any strain" would exacerbate the pain (R. 381-82). Dr. Germain placed White's pain and fatigue at a "6" on a 10-

4

point scale (R. 382). Dr. Germain answered "no" when asked if he had been able to relieve White's pain with medications completely without "unacceptable side effects" (R. 382). Dr. Germain also opined on White's residual functioning capacity ("RFC") if placed in a normal work environment, stating that White had multiple limitations, including (1) the ability to sit for just 0 to 1 hour and stand/walk for just 0 to 1 hour in an 8 hour day, (2) the inability to sit or stand/walk continuously in a work setting, (3) the ability to occasionally lift or carry 0 to 10 pounds and never lift or carry more than 10 pounds, (4) significant limitations in reaching, handling, fingering or lifting, (5) marked limitation in the ability to grasp, turn or twist objects and (6) marked limitation in the arms for reaching (R. 382-84). Dr. Germain stated that White's symptoms would likely increase if placed in a competitive work environment, that he could not do a full time competitive job that requires activity on a sustained basis and that he was incapable of even low stress work ("stress is the most constant and aggravating factor") (R. 384-85). Finally, Dr. Germain stated that the earliest date that the symptoms and limitations in the Questionnaire applied was July 2005 (R. 386).

White also consulted several other physicians. In July 2008 White saw Dr. Fauzia Rana, whose thoroughgoing examination produced a host of detailed physical findings (R. 321-28). Dr. Rana diagnosed Graves' disease, possible degenerative arthritis with possible lumbosacral radiculopathy, uncontrolled high blood pressure and gross obesity (R. 323).

In August 2008 Dr. C.A. Gotway, a state agency physician, reviewed the

5

record evidence and concluded that White could lift and/or carry 20 pounds occasionally and 10 pounds frequently and could stand and/or walk about 6 hours in an 8-hour day and sit about 6 hours in an 8-hour day (R. 329-36). Dr. Gotway also indicated that White was limited in his ability to perform postural maneuvers (R. 331).

In addition to his physical ailments, in July 2005 White began experiencing daily feelings of depression (R. 337, 366), and Dr. Germain referred him for psychiatric treatment (R. 377-78). In 2008 White told treating psychiatrist Dr. Robert Buchanan that he continued to experience daily feelings of depression and that he was "angry a lot" (R. 337, 366). Dr. Buchanan confirmed that White displayed an angry attitude when answering questions (R. 337, 366) and diagnosed White with major depression, possible Post-Traumatic Syndrome Disorder ("PTSD") and probable mixed personality disorder with narcissistic features (R. 339, 367). Dr. Buchanan stated that White's depression set in when the first symptoms of Graves' Disease manifested themselves and White became unable to work (R. 339, 367).

In November 2008 state agency psychologist Dr. Hermsmeyer reviewed the record evidence and concluded that White would have problems with understanding, remembering and carrying out detailed instructions (R. 344-61). Dr. Hermseyer also found that White retained the mental capacity to perform simple one- and two-step tasks at a consistent pace (R. 344-61). Finally, in July 2010 Dr. Sarlo supervised a psychological evaluation of White and completed a

6

"Psychiatric/Psychological Impairment Questionnaire" (R. 395-402, 405-12).

## White's Hearing Testimony

White testified on his ailments and limitations at the July 14, 2010 hearing. Much of that testimony dealt with his pain and its effects. On a "normal day" the pain is "not that bad . . . probably a four or five until I sit a certain way, of [sic] long time. And then I have to either adjust, or go lay down, or something like that before it gets worse" (R. 56). At its worst the pain was a "12" on a 10-point scale and the pain from his lumbar strain and sciatica was like "a toothache throughout your whole back, through your leg" (R. 55-56). White also said that the pain is made worse by sitting, standing or walking (R. 56). White stated that the chronic pain made caring for his personal needs difficult (R. 71-72) and that his pain medication affected his ability to concentrate to such a degree that a task that would normally take 10 minutes now took more than one to two hours to complete (R. 69).

White also recounted the effects of his Graves' Disease, testifying that the disease caused him to gain up to 80 pounds, which contributed to major adverse effects in his lifestyle (according to White he is now "sedentary at home and that's it") (R. 51, 59, 63). White further stated that he rarely lifted or carried anything and that he was often winded and out of breath (R. 63), adding that his Graves' Disease damaged his vision (R. 60-61) and caused memory loss (R. 65, 71).

Additionally, White testified to his depression and its effects. White stated that he started to feel depressed around the time of his thyroid surgery and that attempts at treatment have been futile (R. 58). White said that negative effects of

7

the depression include (1) a marked reduction in energy (also possibly attributable to the weight gain) (R. 58-59), (2) a personality change (he is now very irritable) (R. 61), (3) a decrease in drive (R. 70) and (4) the need to expend a considerable effort just to maintain normal social interactions (R. 71).

White also spoke of the practical effects of his ailments. White said that his constraints include waking up approximately every hour, an inability to walk more than half a block to a block without stopping, an inability to stand more than 15 minutes, an inability to for sit more than an hour before changing positions, the inability to lift more than 10 pounds (at least without pain) and difficulty in going up and down stairs. White also reported significant problems with concentration and efficiency (R. 63, 69). White testified that those problems were the reason he was not able to do more work with loans (R. 68-69):

> Everything is almost an impossible effort....the concentration level is not there or the pain level is there. One of the two. And if I take the painkiller, then I really can't concentrate. And if I try to concentrate, work would take me, normally would have taken me 10 minutes to do takes me an hour to two hours to do. Because if I stop, I have to start all over again and go back to square one.

### Medical Testimony at the Hearing

Dr. Ronald Semerdjian testified at the hearing based on a review of the medical records, not on an in-person examination of White. His testimony rejected, pretty much in its entirety, the findings and diagnoses of all of the examining doctors.

Thus Dr. Semerdjian opined that Dr. Germain failed to include "evidence of physical findings...to substantiate what he's saying" (R. 81). In particular he stated

8

that White's current impairments "would seem to be psychiatric and the low back pain" (R. 74), and he did not support Dr. Germain's diagnosis of chronic lumbosacral strain and the corresponding limitations that Dr. Germain placed on White (R. 81). Dr. Semerdjian also stated that while White "may" have sciatica, he was unable to tell that from the record (R. 80-81). Dr. Semerdjian could not "say that he meets a listing with the back because there's no documentation that's available for examination" (R. 79), but he acknowledged that there may be problems that could come out during another evaluation (R. 79-80). Moreover, Dr. Semerdjian acknowledged that White's obesity could also be a contributing factor to his back pain (R. 85-86).

Additionally, while Dr. Semerdjian agreed with the diagnosis of Graves' Disease, he disagreed that any thyroid condition would have caused White's weight gain (R. 76-78, 86-88)--though he offered no other explanation. Nor did Dr. Semerdjian find record support for "a marked restriction in the use of the hands for grasping and turning objects"--he stated that there may be difficulties with the legs or feet, but that the record was not sufficient on the issue (R. 82). Dr. Semerdjian also found insufficient evidence to determine if White's lack of energy stemmed from his thyroid condition (R. 87-88). Finally, Dr. Semerdjian acknowledged White's diagnosis of depression, but he did not explore the diagnosis extensively (R. 77, 86-88).[3]

---

[3] If what has been said here and what is recounted later as to the so-called "treating physician" rule leaves the reader with the impression that the performance by persons called to provide "expert" testimony at ALJ hearings can be

9

**Vocational Expert's Testimony**

At the hearing ALJ Harmon asked Vocational Expert ("VE") Thomas Dunleavy about the availability of jobs for a hypothetical individual who could lift and carry 20 pounds occasionally; lift and carry 10 pounds regularly; stoop, crouch, kneel and crawl occasionally; sit for 6 out of 8 hours and stand for 6 out of 8 hours (R. 94). In addition, the hypothetical individual would be limited by obesity (R. 94).

In response the VE testified that such a hypothetical individual could perform such jobs as cafeteria attendant (3,000 regional jobs available), laundry folder (3,000 regional jobs available) and packager (5,000 regional jobs available) (R. 95). In addition the VE stated that if the hypothetical individual needed to stand after one hour of sitting, or conversely sit after one hour of standing, there would be one and two-step jobs available at the sedentary level as a lens inserter or assembler (2,000 jobs available at the regional level) (R. 100). To perform that job successfully, the hypothetical individual would have to perform at a level within 15% of the average worker (R. 100). But the VE testified that if the hypothetical individual could not engage in a low stress job on a competitive basis, there would be no competitive jobs available in the national economy (R. 97).

---

off-putting because the opinions that are expressed appear to reflect a nonobjective mindset, the reader's reaction is accurate. There is a reason that our Court of Appeals is so frequently critical of the output received from ALJs in social security cases (Judge Posner's repeated criticisms seem most trenchant, but panels to which he is not assigned have said much the same thing): All too often an ALJ is favored with a one-sided view such as that displayed here by Dr. Semerdjian and, considering that "expert" as an impartial witness, the ALJ chooses to credit his or her opinions in preference to those offered by treating physicians, who might arguably be thought of as favoring the patient.

## Standard of Review and Applicable Law

In reviewing Commissioner's decision, this Court considers the legal conclusions de novo (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)). But because factual determinations, by contrast, receive deferential review, courts may not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision if it is supported by substantial evidence (id.). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citations omitted)).

As cases such as Haynes, 416 F.3d at 626 (internal quotation marks and citations omitted) teach:

> In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion [but] need not...provide a complete written evaluation of every piece of testimony and evidence.

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)). Reversal is also required if the ALJ has committed a legal error, regardless of how much evidence supports his or her determination (Binion on behalf of Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009), citing Section 423(a)(1)(E)). "Disability" is defined in Section 423(d)(1)(A) as an "inability to engage in any substantial gainful activity by reason of any medically determinable

11

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Claimants must also demonstrate that the disability arose during the period when they were insured (Section 423(a)(1)(A) and (c)(1)).

Social security regulations set forth a sequential, five-step inquiry that must be conducted to determine whether a claimant satisfies this definition (Liskowitz, 559 F.3d at 740, citing Reg. §§404.1520 and 416.920). Specifically, the ALJ must determine (Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001), citing Reg. §404.1520):

> (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disability impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.

At step five of the analysis the ALJ may use the Medical Vocational Guidelines to determine whether the claimant's exertional limitations prevent him from performing any work (Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005)). If, however, the claimant suffers from both exertional and nonexertional impairments, the Medical Vocational Guidelines are not determinative but rather "provide a framework for consideration" (id. at 471, quoting Reg. Pt. 404, Subpt. P., App. 2 §200.00(e)(2)).

## ALJ Opinion

After reviewing the evidence and applying the five-step analysis outlined

above, ALJ Harmon made a series of findings (set out here in paraphrased form rather than verbatim):

     1. White met the insured status requirements of the SSA through September 30, 2007 (R. 18).

     2. White has not engaged in substantial gainful activity since the alleged onset date of June 1, 2005 (R. 18).

     3. White has had "severe impairments" since the alleged onset date, including Graves' Disease, low back strain with sciatic pain, hypertension without end organ damage, obesity and mood disorder (depressive) (R. 18).

     4. Since June 1, 2005 White has not had an impairment or combination of impairments that meets the listed impairments (R. 19).

     5. Since June 1, 2005 White has had the RFC to perform less than the full range of sedentary work defined in Reg. §§404.1567(a) and 416.967(a) (R. 21).

     6. White can lift/carry 20 pounds occasionally and 10 pounds frequently; sit 6 of 8 hours; stand/walk 4 of 8 hours; occasionally climb stairs or ramps, stoop, bend, squat, crouch, kneel and crawl; perform no work on ladders, ropes or scaffolding and only occasionally use the lower extremities to operate foot or leg controls (R. 21).

     7. White is limited to unskilled routine and simple work involving one or two tasks (R. 21).

     8. Since June 1, 2005 White has been unable to perform any past relevant work (R. 22).

     9. Before June 1, 2005 White was a "younger individual age 45-49" (R. 23). On June 9, 2009 White's age category changed to "an individual closely approaching advanced age" (R. 23).

     10. White has at least a high school education and is able to communicate in English (R. 23).

     11. Before June 9, 2009 transferability of job skills was not material to the determination of disability because White was "not

disabled" at that time, regardless of whether or not he had transferable job skills (R. 23).

12. Beginning on June 9, 2009 White has not been able to transfer job skills to other occupations (R. 23).

13. Before June 9, 2009 there were jobs that existed in significant numbers in the national economy that White could have performed (R. 23).

14. But from and after June 9, 2009 there have been no jobs that exist in significant numbers in the national economy that White could perform (R. 24).

15. Although White was not disabled before June 9, 2009, he became disabled on that date and has continued to be disabled through the date of the decision (R. 24).

16. White was not disabled at any time before September 30, 2007, the date he was last insured (R. 24).

This opinion will apply the earlier-stated principles to those findings.

## Analysis of ALJ Decision

White makes several arguments as to why ALJ Harmon's decision should be overturned. Each is addressed separately below.

**Error in Hypothetical Questions**

White first argues that ALJ Harmon erred in determining White's RFC by failing to include his limitations in concentration, persistence and pace and by failing to include those same limits in the hypothetical questions asked of the VE. Although ALJ Harmon found that White had "moderate difficulties in maintaining concentration, persistence, or pace"(R. 19), he did not explicitly include those limitations in his hypothetical questions to the VE. Commissioner argues, quoting O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010), that ALJ Harmon's

questions were appropriate because they utilized "alternative phrasing specifically exclud[ing] those tasks that someone with the claimant's limitations would be unable to perform."

Hypothetical questions posed to vocational experts must generally include all relevant limitations supported by the medical evidence (Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002)). At the same time, courts will not enforce a "per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases" (O'Connor-Spinner, 627 F.3d at 619). Thus courts will sometimes allow the exclusion of those limitations "when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform" (id.). But that exception is a limited one--see the qualifying language in the same case (id. at 620).

As what has just been said suggests, line-drawing in this area is difficult--compare the discussions of the subject in O'Conner-Spinner, 627 F.3d at 620 and in such earlier cases as Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir.2002), Simila v. Astrue, 573 F.3d 503, 521-22 (7th Cir. 2009) and Stewart v. Astrue, 561 F.3d 679, 685 (7th Cir. 2009). But in sum, despite Simila's "troubling" (573 F.3d at 521) upholding of a hypothetical that had omitted the claimant's moderate limitations in concentration, persistence and pace under the circumstances of that case, it is clear that in most cases those limitations must be included explicitly in the hypothetical.

Here White's difficulties with concentration, persistence and pace are not

15

clearly tied to the disorders that ALJ Harmon mentioned in his hypothetical questions to the VE. ALJ Harmon mentioned White's "pain," "medications" and "depression" in the hypothetical questions (R. 93), but not in such a way as to link those mental limitations to his pain. Instead the ALJ found White's difficulties with concentration, persistence and pace to be a symptom of his "Mood disorder" (presumably referring to White's depression) (R. 19).

But importantly, there is no indication in the record that the VE understood that "alternative phrasing" to include those limitations. This Court certainly cannot simply assume that the VE would automatically understand "pain and depression" to translate into difficulties with concentration, pace and persistence. Because ALJ Harmon should have included--but did not include--those limitations in his hypothetical questions to the VE,[4] remand is called for on that score.

**Failure To Assign Proper Weight to Dr. Germain's Opinion**

White next contends that ALJ Harmon erred by failing to give Dr. Germain's medical opinion controlling weight. That position comes under the rubric of the "treating physician rule," which states that the ALJ must "give controlling weight

---

[4] White also points out that ALJ Harmon did not take White's inability to meet production requirements into account (an argument to which Commissioner offers no response). In that respect the VE testified that for White to work successfully at the slowest-pace job (lens inserter) he would have to produce within 15% of the average worker (R. 101). But White testified that a task that would normally have taken him 10 minutes to perform now takes him one to two hours (R. 69), and Dr. Sarlo noted White's limited abilities in that regard (R. 408-09). Yet despite the VE's testimony that no jobs at all would be available to someone who could not achieve 85% performance (R. 97), ALJ Harmon did not take that into account in his determination. Such an omission is unacceptable--this Court cannot be called on to guess at an explanation. Upon remand that gap must be filled.

to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence" (Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006), internal quotation marks omitted). Thus "if the treating physician's evidence and the contrary evidence are in equipoise, his view prevails" (id. at 377). Put another way, Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011), (internal quotation marks and citations omitted) states:

> A treating physician's opinion that is consistent with the record is generally entitled to controlling weight. An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection....When an ALJ decides to favor another medical professional's opinion over that of a treating physician, the ALJ must provide an account of what value the treating physician's opinion merits.

Additionally, as Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009) teaches, if the ALJ rejects the treating physician's opinion, the regulations require the ALJ to consider a host of specified factors.

ALJ Harmon's stated reasons for disregarding large portions of Dr. Germain's opinion are not sufficient. All he said on that score was this (R. 22):

> The medical expert disagreed with the findings of Dr. Jermaine [sic] in Exhibit 15F. His opinion is disproportionate to the clinical and diagnostic findings in the file and also not reflected in Dr. Jermaine's [sic] progress notes.

That does not conform to Reg. §404.1527, which requires "good reasons" to be given. Given what has been said here, the conflicting opinion of Dr. Semerdjian plainly does not suffice to support the rejection of Dr. Germain's opinion (Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003)(per curiam)). And the ALJ's above-

quoted language is extremely vague and provides no details of what ALJ Harmon found to be "disproportionate" or otherwise unsatisfactory.

Although Commissioner's Mem. 6-9 points out a long list of possible flaws, those reasons were not expressed by ALJ Harmon, and the law is "clear that what matters are the reasons articulated by the ALJ" (Jelinek, 662 F.3d at 812, emphasis in the original). This Court cannot take Commissioner's asserted reasons and simply assume that the Commissioner has divined the ALJ's unarticulated views correctly. Again remand is in order.

**Other Defects**

What has been said to this point justifies a remand--twice over, at that--rather than a reversal in White's favor. And White has other strings to his bow: He argues that the ALJ erred (1) by not providing adequate support for his determination of White's RFC and (2) by failing to assess White's credibility properly in connection with that RFC determination. Both contentions have considerable force: As to the first see such cases as Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005), citing SSR 96-8p, and Eakin v. Astrue, 432 F. App'x 607, 611 (7th Cir. 2011), and as to the second our Court of Appeals has commented repeatedly on the use of "meaningless boilerplate" such as that employed by the ALJ here and has opined that it fails to inform the reviewing court of the real grounds for decision (see, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012)).

Moreover, there is obvious merit in White's final contention that the ALJ

18

must--as this ALJ did not--track SSR 83-20 in determining the onset date of White's disability. Here ALJ Harmon disregarded the opinions of both Dr. Germain and Dr. Sarlo, each of which was consistent with White's own alleged onset date of June 2005 and his late date of work in 2004. Yet the ALJ inexplicably chose an onset date of June 9, 2009. In a fashion similar to that already discussed in preceding parts of ths opinion, ALJ Harmon appears to have substituted his own judgment for that of a medical expert (see this Court's opinion in Campbell v. Chater, 932 F.Supp. 1072, 1079-80 (N.D. Ill. 1996)).

But this opinion is already overlong, and any detailed exposition of those added flaws would not alter the outcome. Hence it will simply be expected that the decision on remand will cure those defects as well.

## Conclusion

ALJs are certainly entitled to examine disability applications with a critical eye--and that may be particularly appropriate in periods of high unemployment, when the absence of employment opportunities may make the prospect of receiving such benefits more attractive. But a critical eye is not a jaundiced eye,[5] and that is what the ALJ's decision here--heavily influenced as it was by a seriously flawed opinion by the medical " expert" witness, although the ALJ also bears major responsibility for his own errors as well--appears to exhibit.

Despite the numerous defects in the ALJ's ruling, it cannot be said that

---

[5] Recall Alexander Pope's famous aphorism in Part II of his Essay on Criticism:

> All looks yellow to the jaundic'd eye.

White is entitled to a judgment as a matter of law (among other reasons, the ultimate decision as to the onset date will affect the result in a critical way). Accordingly, for the reasons set forth above, both motions for summary judgment are denied and White's motion for a remand for further proceedings consistent with this opinion is granted. Finally, although a reviewing court such as this one does not have the power to order that White's case be reassigned to a different ALJ on remand (see, e.g., Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003)), under all of the circumstances described here it is recommended that such a reassignment be made.

_____
Milton I. Shadur
Senior United States District Judge

Date: September 17, 2012